## UNITED STATES DISTRICT COURT OF THE DISTRICT OF COLUMBIA

**SUSAN SELTZER**

*Petitioner.*

v.                                                          Petition for Writ of
                                                                 Mandamus

**GARY GENSLER**

Chair, Securities and Exchange Commission

*Defendant*

### DRAFT AMENDED WRIT OF MANDAMUS

In this Writ of Mandamus, Petitioner seeks the Court's affirmation of the following:

1. **SEC's Non-Discretionary Duty:** Uphold the SEC's duty under the Exchange Act to protect investors from potential harm arising from FINRA's actions, specifically the dismissal of meritorious claims by FINRA panels, through a Rule (FINRA R. 12212(c ) that the SEC permitted to block Petitioner's constitutional right to be heard.

2. **FINRA's Defamatory Actions:** Determine the SEC's responsibility to intervene when FINRA allegedly causes harm to an investor through the marketing of defamatory statements, particularly when said actions violate constitutional rights and specific FINRA rules, its Awards Online contractual Terms of Service,  (AWO) restrictions l. for defamation and harassment.

3.  **Protection of Personal Identifying Information (PII):** Ascertain the SEC's duty to act when FINRA fails to adhere to its 1999 Agreement of Understanding, with the SEC, specifically concerning the protection of improperly exposed PII by a FINRA Member Firm and the ensuing identity theft and harm.

4.  **Deletion of Critical Testimony:** Evaluate the SEC's responsibility to intercede when crucial investor testimony is reportedly deleted during a FINRA arbitration.

5.  **Integrity of Arbitration Awards:** Address the propriety of retaining an "Award" document that may have been generated under a breach of an investor's constitutional right to due process and potentially served to shield a member firm from securities law violations a Section 20 (e) violation of the Exchange Act.

Plaintiff Seltzer seeks a Writ of Mandamus from the United States District Court of the District of Columbia, directing the SEC mandate the Self-Regulatory Organization, SRO, FINRA, provide immediate protection to investors from ministerial violations causing injury resulting from lack of oversight by the SEC of their rulemaking process. Is the SEC violating Section 15A(b)(6) of the Exchange Act, which requires, among other things, that FINRA rule making process must be designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade?

The Writ comes before the Court due to violation of Plaintiff Seltzer' s rights to "be heard" in *Kosen et al* Docket 35, resulting in defamation per se, that was used again in FINRA Arbitration 17-01857 by a Party to the *Kosen et al* Decree. Such defamation per se resulted in improper dismissal of Claims with merit due to ministerial violations by SEC in oversight of rulemaking. Mandamus is available since "(1) the plaintiff has a clear right to relief; (2) the

defendant (SEC) has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."

On August 3, 2021, Petitioner filed the Writ of Mandamus (*Seltzer v Gensler*, 1:21-cv-02093). The plea was threefold:

1. To ascertain if FINRA's application of Rule 12212(c) infringed upon constitutional rights.

2. To mandate FINRA to stop spreading defamatory information linked to Petitioner's name through Google search tags and a knowledge graph tied to her business.

3. To determine if FINRA's actions amounted to a violation of Section 20(e) of the Exchange Act.

Since the initial Writ was initially filed, August 3, 2021:

(1) In response to an investor's plea for help, the SEC exacerbated the situation with misleading statements in the Writ. The SEC's refusal to address securities law breaches and its failure to safeguard an investor from its SRO's misconduct were pivotal. This culminated in the Petitioner was forced to shut down her business. The SEC's repetition of known defamation and their breach of Rule 3.3 concerning Candor to the Tribunal is concerning.  If the Ombudsman and SEC had determined that their SRO was harming an investor under the Exchange Act and had taken steps to have FINRA cease and desist in 2020; the outcome would have been different.

(2) The Petitioner discovered the reasons behind the SEC Office of Ombudsman's lack of response to her complaints in 2020 and 2021 as defined in the August 29, 2022, SEC Office of Investigation press release, Exhibit G, attached. Given that the Petitioner was directed to adhere to the Congressionally established administrative procedures for lodging an investor complaint, would this toll the statute of limitations for subsequently filing a complaint in court (referencing

*Seltzer v. FINRA*), especially considering that the SEC did not provide  the mandated investor protection and oversight of their SRO when the Office of Ombudsman remained unresponsive?

The Writ is for substantive ministerial violations in Rule Making for FINRA Rule 12212 (c) which resulted in violation of Petitioner's legal rights, "to be heard." The Writ is an Order to the SEC to (1) complete rule making on FINRA Rule 12212 (c) in accordance with FINRA's declarations in the Federal Register (2007) and (2) to prohibit FINRA from further violations of FINRA Awards Online existing Terms of Agreement.(AWO). The Writ should issue in the interest of investor protection for both SEC's failure to enforce existing Terms of Agreement for FINRA Awards Online (AWO) and in accordance with ministerial violations by SEC oversight of FINRA's SRO rulemaking role that is permitting violations of existing Federal Laws and violations of basic rights to due process, the "right to be heard" before "Sanctions" are arbitrarily imposed for unintentional "behavior" in FINRA Arbitrations. Due to lack of finalizing Rule 12212(c) in 2007, over a decade prior to NASD statements FINRA made they would provide such guidance, the SEC is permitting dismissal of claims with prejudice, deemed by Panel to have merit, based on improper rulemaking of 12212(c).

## DRAFT WRIT OF MANDAMUS COMPLAINT

1. Panel Chair Gormly and FINRA perpetuated a fraud that had no relationship to Claims before the Panel. As evidenced by the attached Exhibits and Timeline, FINRA Executives appeared to use the Forum to protect their member firm, U.S. Bancorp Investments Inc. (USBI) from a violation of their SDNY Deferred Prosecution Agreement. Thus, the topic of the Arbitration shifted from the securities law breaches that Claimant had filed under the Arbitration Contract to solely Claimant and her behavior and Chair's unfounded, fabricated criminal allegations against Claimants; not a traditional role for Courts in determining a Petition to

Vacate. Claimant had a right to be heard before sanctions were used to dismiss all claims (deemed by Panel to have merit after the Case in Chief) with prejudice.

2. The SEC began an investigation of FINRA's Section 20 ( e) violation of the Exchange Act on April 24, 2019 (Exhibit A)  that has resulted in the ongoing harm to Petitioner, but has failed (1) to protect Petitioner from ongoing harm from the devastating injury from their SRO's marketing of defamation, (2) repetition of the defamation to the Court, with full knowledge of its falsity and harm and finally, (3) has failed to complete their investigation of the ongoing harm to Petitioner by FINRA's member firm, USBI, improper filing of a SAR.

## The Parties

3. FINRA was formed in 2007, pursuant to Section 15A of the Securities Exchange Act of 1934 (Exchange Act), through the consolidation of the National Association of Securities Dealers (NASD) and New York Stock Exchange Regulation, Inc., the regulatory arm of the New York Stock Exchange (see *15 US.CA. § 78o-3).* FINRA falls under the regulatory authority of the Securities and Exchange Commission (SEC), but its private, SRO, exercises oversight over all securities firms that do business with the public (see UBS Fin. Servs., Inc. v. W. Va. Univ. Hops.. Inc., 660 F.3d 643, 648 (2d Cir. 2011)).

Petitioner, Susan Seltzer, filed claims for securities law violations under an arbitration contract with U.S. Bancorp Investments, Inc. (USBI).  FINRA hosted the Arbitration forum, 17-01857, for these securities law violations which were improperly dismissed with prejudice based on FINRA Rule 12212 (c).

## Jurisdiction and Venue

4.  **Subject-Matter Jurisdiction**:

This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. See 28 U.S.C. §1331, 2201; 5 U.S.C. §§701-706. Further, under

- **28 U.S.C. §1331**: the United States District Court of the District of Columbia has oversight of this civil action arising under the Constitution, laws, or treaties of the United States.

- **28 U.S.C. §2201**: This pertains to the ability of federal courts to provide declaratory relief, essentially making determinations about legal rights.

- **5 U.S.C. §§701-706**: These sections are part of the Administrative Procedure Act, which allows for judicial review of certain actions by federal administrative agencies.

5. **Venue** is proper because the SEC resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here. 28 U.S.C. §1391 (b) (1)- (2).

- The SEC (Securities and Exchange Commission) is in this district.

- A substantial part of the events or actions that led to the lawsuit took place in this district.

### VIOLATION OF SEC MINISTERIAL DUTY

6. Does the SEC have a non-discretionary duty to remove an SRO that is violating the Exchange Act to aid and abet a Member firm.(Violation of Exchange Act, Section 20(e), by FINRA in FINRA Arb 17-01857.)  (See attached March 2018 Letter to Judge Kaplan[1] and Exhibit C, Memorandum from 2020 to FINCEN which is still pending investigation.)

---

[1] Further, USBI colluded with the FINRA panel chair to order us to withdraw evidence of their AML violations, in our Statement of Claim, without a Motion in Limine, as mandated by FINRA rules. USBI's compliance staff, Ms. Kristi Koshire, and USBI Board Member and Chief Legal

7.  The SEC is no longer overseeing FINRA rules; under the framework established to protect investors, "Under that congressional framework, private entities called self-regulatory organizations ("SROs") exercise a primary supervisory role and, in turn, are subject to SEC oversight. See Saad v. SEC (Saad II), 873 F.3d 297, 299-300 (D.C. Cir. 2017).

4.  **The SEC erred by not considering the difference[2] between posting a document to a website compared to actively marketing a PDF with Google Tag Manager and SEO to harm another** and engage in intentional affliction of emotional distress and harassment. Under the pending Writ, the Court may rule that FINRA's marketing to harm a retail investor is unethical and inappropriate for a quasi-judicial entity, that violates an SRO's duty under the Exchange Act.

5.  **The SEC erred by not reviewing the technology and FINRA R. 12904 (h)that Petitioner asked for assistance on before the knowledge graph was created in 2022 tying the defamation to Petitioner's business.**  Specifically, Petitioner asked the

---

Officer, Gail Van Horn, made fraudulent misrepresentations to cover-up the AML violations in their written response to us when we asked for assistance. They are both registered with FINRA and are named in our FINRA arbitration. USBI seeks a Motion to Dismiss these Respondents, which we must respond to by April 4, 2018.

[2] Defendant, Gensler, responds, ECF 25, P. , "Petitioner objects to and FINRA's continued posting of that decision pursuant to its rules that FINRA promulgated, which the Commission approved 13 years ago." That is not the case.  Petitioner objects to FINRA's proprietary website, that has demonstrated Google Analytics, "marketing" a known defamatory document tied to Petitioner's name in a Google Search."

ombudsman about FINRA's node use:

In the context of defamation law, republication is often defined as any act that presents the defamatory content to a new audience or materially updates the content in a way that reaffirms or re-emphasizes its defamatory meaning. Changing the URL could potentially be considered a republication if it's done in a manner that effectively represents the content to a new audience or reaffirms its meaning.

Based on two distinct URLs:

1. **https://www.finra.org/node/86265** appears to be a more general node or content page on FINRA's website.

2. **https://www.finra.org/sites/default/files/aao_documents/17-01857.pdf** directly points to a PDF document, which seems to be an arbitration award or similar document, given the typical format of such URLs on FINRA's site.

If the content of the PDF is indeed defamatory and the content was moved from the original node URL to the direct PDF URL (or vice versa), it could potentially be viewed as a republication, especially if the move increased visibility or accessibility of the content. Another factor to consider is if there were any additional promotional or linking efforts that drove attention to the new URL, which there was—the knowledge graph Petitioner filed, 1:22-cv-0330, ECF 1. P. 34.

6. _Oja v Army Corps_. In _Oja_, "however, the court also ruled that about "the same private information at a different URL address [within the same Web site] . . . _that disclosure constitutes a separate and distinct publication – one not foreclosed by the single_

*publication rule*[3] – and [the agency] might be liable for a separate violation of the Privacy Act." Id. at 1133-34.   SEC would be comparable to the "Agency" that violated the Privacy Act through a separate URL, given FINRA's 1999 Memorandum of Understanding with SEC (Exhibit K).

7. Petitioner filed claims with SEC Office of Ombudsman, Exhibit E, about FINRA or another entity tagging to the defamation and Petitioner's PII improperly filed publicly by a FINRA Member Firm.

8. The Terms of Service of FINRA Awards Online prohibit harassment and the SEC approved rule 12904 (h) does not grant FINRA the right to harvest data through Google Analytics on an investor and perceived competitor.

9. Exhibit Z demonstrates the wealth of data that a website (FINRA Awards Online-AWO) can obtain through Google Analytics which FINRA has installed on its AWO.  Petitioner

---

[3] "In March 2003, *Oja* filed a Second Amended Complaint, alleging that the USACE published the same private information at a different Internet address in December 2000. If, in fact, the USACE published the same private information at a different URL address, then that disclosure constitutes a separate and distinct publication — one not foreclosed by the single publication rule — and the USACE might be liable for a separate violation of the Privacy Act. However, such an additional claim is still subject to the statute of limitations, which, under the Privacy Act, is two years from the date the private information is made public. *See* 5 U.S.C. § 552a(g)(5).

*Oja v. United States Army Corps of Engineers*, 440 F.3d 1122, 1133-34 (9th Cir. 2006)"

believes discovery from FINRA's Google Analytics at AWO would provide the extent of the invasion of Petitioner's privacy that was never approved by the SEC in their oversight of FINRA rulemaking.

10. **The SEC erred by not updating their FINRA Rulemaking** (FINRA R. 12904) when their SRO developed technology to create knowledge graphs that were then used to harass an investor.  The Rule states 12904 (h), "(h) All awards shall be made publicly available." Petitioner filed  a request with the SEC Ombudsman to clarify this Rule 12904, given FINRA's "marketing a document with Search Engine Optimization" and knowledge graphs.  The Ombudsman never responded; which resulted in further harm.

11. In sum, the initial process (FINRA Arbitration – 17-01857 ) was fundamentally flawed due to a breach of Petitioner's constitutional rights, thus any outcomes of that flawed process, including defamatory statements, should not be given weight or repeated, especially by the regulatory body overseeing the entity that conducted the flawed process, due to lack of mandated oversight of FINRA, its SRO's rulemaking. (See Leave to File Motion to Strike).

12. The Court may determine if the delegated powers and responsibilities given to Chair Gensler and the SEC—concerning the issues raised in this Writ—are constitutionally sound. The crux of the matter is whether this delegation adheres to the "intelligible principle" doctrine, which requires clear legislative guidance for any authority granted to an entity or individual.

13. **FINRA as a Potential "State Actor":** Past legal precedents have established that certain rule violations might classify FINRA as a "state actor." In the context of the present case, this characterization is significant. If the Court finds that FINRA denied the investor the right to be heard due to a violation of Rule 12212(c), this could render FINRA and its

arbitrators ineligible for arbitral immunity, especially concerning allegations of defamation per se.

## THE SEC PLACED THE PROTECTION OF THEIR SRO OVER THEIR DUTY TO INVESTORS UNDER THE EXCHANGE ACT

14. **<u>The SEC violated 3.3 Lack of Candor to the Tribunal</u>** by failure to explain to the Court in their response to the Writ of Mandamus all the administrative actions taken by the Petitioner to resolve the issues that had caused significant and material harm.  See Timeline below on all the administrative actions that Petitioner had taken to stem the injury by FINRA and its Member firm, USBI, that the SEC never mentioned to the Court in their responses to the Writ and Motions to Dismiss the Writ of Mandamus.

15. The SEC did not respond to an investor's SEC Ombudsman Complaint or Whistleblower Complaints about using FINRA Awards Online in conjunction with JS Nodes and a knowledge graph to tie SEC-known defamation with the investor's business. FINRA has no right to expand their Google Analytics to Petitioner's website, Check the Ticker SBC, because Petitioner filed a claim as an investor in FINRA Arbitration Forum for losses resulting from securities law violations.

16. It appears FINRA's actions suggest it is neither "functionally subordinate to the SEC" nor operating under its supervision.  The SEC's response to the Writ of Mandamus is reinforcing this belief, which is the cause of the injury to the Petitioner; lack of oversight of its SRO by the SEC.

    <u>It Appears FINRA is no Longer Functionally Subordinate to SEC harming Petitioner.</u>

17. The essence of the argument advanced in both *Kim v FINRA* and *Alpine v FINRA* is the foundational assumption that FINRA operates subject to the oversight and control of the

SEC. However, evidence presented by the Petitioner in this Amended Writ, challenges this premise, suggesting that FINRA may no longer adhere to this subordinate role. This deviation not only undermines the DOJ's assertion that FINRA is "functionally subordinate" but also calls into question Congress' mandate for the "intelligible principle."

18. Specifically, FINRA Rule 12212(c), which should be under SEC's purview, failed to prevent a constitutional infringement on the right to be heard for both brokers and investors. The SEC's oversight in this regard seems lacking, as evidenced by their apparent disregard for warnings on this issue. This oversight concern is further highlighted by the Securities Industry Association's letter to the SEC Secretary, Jonathan Katz, regarding the proposed changes to FINRA R. 12212(c) in 2005 in the Federal Register:

" Subsection (c) Should Have Procedural Requirements and Should Not Expand Current Practice.

- Proposed Rule 12212(c) authorizes dismissal of a claim, defense or arbitration. with prejudice "as a sanction for a material and intentional failure to comply with an order of the panel if prior warnings or sanctions have proven ineffective." (Emphasis added.)Subsection (c) does not have a notice requirement to afford the offending party an opportunity to be heard; it potentially allows a panel to dismiss a claim with prejudice without any prior notice.
- Subpart (c) should be amended in the same manner as subpart (a) to provide for notice and an opportunity to be heard.

The term "warnings" should be deleted from subpart (c). It is not a defined term and introduces unnecessary ambiguity."

<u>It Appears SEC is Permitting FINRA to act Outside Bounds of "Intelligible Principle."</u>

19. The SEC appears to allow FINRA to act outside the bounds of the "Intelligible Principle" established by Congress, potentially violating constitutional safeguards. As articulated in

*Kim*, the delegation of authority is constitutionally valid if it includes clear direction on general policy, identifies the agency tasked with its execution, and sets the parameters of the delegated power. *Am. Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946)*.

20. The assertion in *Kim* suggests that FINRA's activities comply with these criteria, falling within established precedents and meeting the "intelligible principle" benchmark. Notably, the plaintiff, Kim, did not challenge the presence of an intelligible principle or pinpoint any specific language delegating authority in a problematic manner.

21. It is indeed Congress's responsibility to provide clarity on policy, identify the overseeing agency, and define authority limits. *Am. Power & Light, 329 U.S. at 105*. This guidance, as reiterated in various cases, outlines the parameters and objectives for SROs to achieve, forming the backbone of the "intelligible principle" in the public nondelegation doctrine.

22. Despite these established principles, the question arises: Do FINRA Executives have the liberty to bypass Petitioner's constitutional right to due process via Rule 12212(c)? Notably, when an implied cause of action arises from the Constitution, it's paramount to center the analysis on the principles of separation of powers. *Abbasi, 137 S. CT. 1857*.  As Petitioner contends.

23. FINRA executives did not have immunity to engage in fraud-they ordered the Hearing ended and published a document that defamed Petitioner and her business potentially to aid and abet their member firm, USBI, in escaping securities law violations and FINCEN-filing a false SARS. (See Exhibit B, B-1 Memorandum to SEC Marc Berger on SAR Complaint

to SEC Office of Whistleblower. FINRA executives[4] did not have immunity to violate ADA , federal law, Americans with Disabilities Act.  (See Exhibit D, Petitioner's spouse's request of R. Berry about assistance with a hearing disability accommodation.)

The SEC refused to investigate these clear and distinct violations of the Intelligible Principle:

24. **Ongoing Harm and SEC's Failure to Address Potential Section 20(e) Violation of the Exchange Act**

25. **Improper Use of SAR:** By failing to adjudicate the misuse of a Suspicious Activity Report (SAR) in arbitration—a SAR used to conceal the Member Firm USBI's own failings under an existing Deferred Prosecution Agreement with the Southern District of New York (SDNY)—FINRA exacerbated the harm experienced by the Plaintiff, **which is ongoing.** See Exhibit C – Petitioner 2020 Request of FINCEN and August 24, 2023, Memorandum – Request to USBI to end the recent and ongoing harm from the false SARS filed against Petitioner in 2016.  The subject of FINRA Arbitration 17-01857.

---

[4] FINRA Executive, Richard Berry, FINRA Director of Arbitration denied Plaintiff's request for an ADA accommodation for a decade-old hearing disability for accommodations for her hearing loss at the FINRA Hearing; this is all confirmed from the documents at the DR Portal.  Respondent USBI stated Claimant was feigning the disability, Mr. Berry denied Claimant's request without first accepting Claimant's hearing medical records before the decision was made by the Panel and he refused to reconsider the harm after the three USBI representatives were removed from the case due to the extortive orders by the Panel—that if Claimant wanted an accommodation for the USBI representatives to appear at the Hearing, Claimants would have to pay up front, an uncapped amount of costs (estimated at over $60,000.)

26. The SEC Ombudsman was informed that the SEC misused FINRA R 12212 (c) to protect their member firm and ask the SEC to assist and investigate.  The Respondent filed a Motion to Dismiss all claims. The Panel denied USBI's  Motion as it was after the Case and Chief.   The Panel had established merit to the claims.  Thus, they filed a false and defamatory statement, that has no bearing or truth, to for the first time using FINRA R.12212 (c)to dismiss an investor's claims that had established securities law violations.  In sum, it appears, the SEC is permitting its SRO to dismiss securities law violations through a fraudulent use of FINRA R. 12212 (c).

27. **Intervention of FINRA Executives:** The SEC permitted FINRA executives to intervene in the arbitration, falsely alleging that the Plaintiff engaged in bank loan fraud and money laundering (this is on the Arbitration record). FINRA's Director of Arbitration, Richard Berry violated the principle that the Forum cannot be involved in any way in an Arbitration.  Mr. Berry filed improperly a document about a SAR in the DR Portal. (See July 2011 SAR Notice filed by Richard Berry in DR Portal )  Such a violation of FINRA forum rules violated Petitioner's right to a fair and unbiased Hearing; FINRA staff are prohibited from interfering a filing documents at the DR Portal to benefit a member firm.

28. Petitioner is experiencing ongoing harm from the Member Firm that filed the false SAR; due to the SEC's lack of oversight of FINRA and permission of Section 20(e ) violations of the Exchange Act. See August 23, 2023, Memorandum to James Chosy, USB General Counsel.

29. The SEC is permitting FINRA to violate rules of evidence and permitting FINRA to destroy critical portions of Petitioner's Case in Chief Testimony and refuses to investigate

despite complaints to the SEC Ombudsman and Whistleblower complaints.  This is confirmed in DR Portal filings.

30. **Rule 3.3 - Candor Toward the Tribunal**

The SEC's counsel appears to have misrepresented the nature of Petitioner's filing to the court. Contrary to their depiction in Docket 14-1, Petitioner's action was not in any way a "Petition to Vacate" but a substantive complaint addressing violations of constitutional due process rights and specific breaches under FINRA R. 12212 (c).

31. With full knowledge of the numerous filings of defamation and harm by FINRA, the SEC further harmed Petitioner by filing the defamatory statements that were only permitted by violation of FINRA R. 12212 (c) and Petitioner's "rights to be heard" before sanctions are ordered.

32. **Issue of SEC's Lack of Candor and Transparency:**

In ECF 14-1, P. 8, Gensler/SEC Counsel stated, "Petitioner complains of defamation and harassment allegedly because of the dismissal (P. 10)." However, they failed to acknowledge or reference Exhibit C. This exhibit delineates the harm Petitioner suffered due to the improper use of AWO and Google tags, information that Petitioner had previously provided to the SEC Ombudsman.  The SEC failed to acknowledge their detailed knowledge of the harm they were aware of to the Court.  (See attached Memorandum to Jane Norberg, SEC Office of Whistleblower.

33. The SEC's omission and neglect to address the complaints and warnings they received from Petitioner between 2019 and 2022 in their response to the Writ is concerning. This behavior signifies a profound lack of transparency and candor on the SEC's part.  (See attached Motion to Strike the SEC's responses to the Writ that caused further injury to Petitioner.)

<u>VIOLATION OF SEC DUTIES UNDER EXCHANGE ACT TO PROTECT AN INVESTOR</u>

34. THE SEC permitted FINRA staff and its Panel to use the FINRA Forum for an illegitimate purpose- to defame a deemed competitor and protect a Member firm from Section 20 ( e) violations of the Exchange Act of 1934.[5]

35. The SEC permitted FINRA to conceal the harm caused by a false SAR filed by their member firm on April 5, 2016, that is ongoing. It was only possible since FINRA staff permitted the Panel to violate its Rule 12212 (c)  to defame an investor whose accounts were inappropriately blocked by deficient AML procedures.  It is without question if USB approved a substantial mortgage to Petitioner on April 4, and the next day their brokerage subsidiary, USBI, filed a SAR on Petitioner and blocked access to their accounts, USB breached the most basic tenets of KYC, Know Your Customer.  Further, USBI had

---

[5] Courts interpreting Section 20(e) have generally agreed that it consists of three elements: (1) a securities law violation by a primary wrongdoer, (2) "knowledge" of the violation by the defendant, and (3) substantial assistance by the aider-abettor in the primary violation.  In this instance, (1) there was a securities law violation by USBI that harmed Petitioner,  (2) FINRA was aware of the securities law violation and Richard Berry, FINRA Director of Arbitration, intervened several times in the Arbitration (filing information on SARS to the Arbitrators through the DR Portal and contacting the Arbitrators on June 25, 2018 to imply Seltzers had engaged in bank loan fraud and money laundering) and (3) FINRA used 12212 (c) to protect USBI from securities law violations and filing a false SAR to harm an investor.

procedural rules that prohibited blocking an existing customer's access to their brokerage account without 30 days' notice.  Petitioner received no notice.

36. It is not happenstance that the line of cross examination for which Petitioner cried out in pain, dropped a pen in frustration, that ended the Hearing, was from the abuse under cross examination that Respondent's counsel engaged in concerning what happened April 5, 2016, when their primary account was blocked from trading.  He falsely claimed that Petitioner could trade in any account and chose not to.  That was categorically false. Petitioner could only sell stock in their non-IRA accounts; due to the tax effects, to raise the cash for their mortgage down payment.  He pushed and pushed to get Petitioner to agree to a false statement.  Further, Mr. Seltzer tried to object, and Respondent Counsel yelled over his objections, as did Panel Chair Gormly.  That was the end of the Hearing and Arbitration.

37.  FINRA arbitrators and FINRA staff do not have absolute immunity when there are rule violations or improper use of an arbitration forum that violates Federal laws.  As defined recently in USCA 23-5129; because the SEC requires FINRA to enforce its rules, such as enforcement activities by FINRA are state action under Moose Lodge.

USCA Case #23-5129    Document #2014466        Filed: 08/28/2023    Page 35 of 64

of state and local [] authorities[.]" *Id.* at 177. Here, FINRA is required to enforce its rules and federal law or face SEC sanctions. 15 U.S.C. § 78s(g)(1), (h)(1). Because the SEC requires FINRA to enforce its rules, such enforcement activities by FINRA are state action under *Moose Lodge.*

*Stock Exch.*, 452 F.2d 935, 941 (5th Cir. 1971) ("The intimate involvement of the Exchange with the [SEC] brings it within the purview of the Fifth Amendment controls over governmental due process."); *Crimmins v. Am. Stock Exch., Inc.*, 346 F. Supp. 1256, 1259 (S.D.N.Y. 1972) ("When an exchange conducts such proceedings under the self-regulatory power conferred upon it by the 1934 Act, it is engaged in governmental action[.]").

**Under the Exchange Act of 1934, the SEC's duty is first to an Investor; not to an SRO.**

38. No proposed rule change may take effect unless the SEC finds that the proposed rule is consistent with the requirements of the Exchange Act, 15 U.S.C. § 78s(b)(2); and the Commission has the power, on its own initiative, to "abrogate, add to, and delete from" any SRO rule if it finds such changes necessary or appropriate to further the objectives of the Act, 15 U.S.C. § 78s(c). In short, the Commission has broad authority to oversee and to regulate the rules adopted by the SROs relating to customer disputes, including the power to mandate the adoption of any rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights.

## TIMELINE AND EXHIBITS TO EXPLAIN ALLEDGED SECTION 20(e)VIOLATIONS OF THE EXCHANGE ACT OF 1934

39. Petitioner files a Timeline and Exhibits to demonstrate why she believes the SEC and FINRA were concealing the truth concerning the use of a SAR that caused the losses and harm to petitioner that necessitated FINRA Arbitration 17-01857.

**March 9, 2018** - Petitioner Notified Authorities that FINRA Was Using its Arbitration Forum for Improper Purposes –and Notified the SEC (See March 2018 Letter to Judge Kaplan)  This was filed *before* the Arbitration began on June 25, 2018.

**June 19, 2018** – Richard Berry intervenes[6] in FINRA Arbitration and files a notice about a SAR without permission of Claimants, the *day before* the Panel is provided the briefed Motions on USBI's request for a Motion in Limine to prohibit Petitioner from discussing the false SAR filed the day after (April 5, 2016) they were approved for a large mortgage (April 4, 2016) that

---

6

| FINRA Correspondence | 06/19/2018 | | FINRA DR |
|---|---|---|---|



blocked access to their accounts for trading to sell stock for their down payment. See Attached

6.19.18 SAR document intervention by Richard Berry at FINRA DR Portal.

**June 20, 2018** – Mr. Seltzer mails a request to Richard Berry, Director for FINRA Arbitration

for ADA Accommodation (Exhibit D)  Mr. Berry did not respond to Mr. Seltzer's fair ADA

request.

**April 24, 2019** – Letter to Petitioner from SEC re: Opening investigation of fraud in FINRA 17-

01857 (Exhibit A) by FINRA and Panel for false criminal allegations, threats with a stun gun,

improper use of a FINRA Forum and defamation and possible Section 20( e) violations of the

Exchange Act.

**September 4, 2019** – Petitioner requests SEC Ombudsman intervene and protect an investor for

the marketing of defamation.  There was no response from the SEC.

**October 17, 2019** – Petitioner filed claim with NYAG, Case #19-041329, to ensure FINRA

would cease and desist from violating the Terms of Service of its AWO and "harassing and

defaming Petitioner." (The Contract was under the law of the State of NY.)

**December 18, 2019** – NYAG referred Petitioner to SEC NY Marc Berger (Exhibit B) which

includes Exhibit B-1; with notice to SEC that it was perceived cause of the filing of the false

SAR against Petitioner that is causing ongoing harm.

**March 12, 2020** – Petitioner files a Whistleblower Complaint with the SEC : 15840-366-803

"FINRA refuses to investigate the false and defamatory statements posted by FINRA staff at the

Awards Online. FINRA has refused to investigate the concealment of the ADA requests at the

Awards Online that FINRA staff  approved. The issue is a fraudulent scheme by FINRA staff,

not the Panel. Therefore, the issues are not the subject of a Petition to Vacate. After Petitioner

sought to obtain assistance from FINRA, they and their member firm (February 2020) began to

use FINRA nodes and Google Marketing tags to link to the defamation at their Awards Online.

This is retaliation."

**October 6, 2020** – Petitioner contacts SEC Ombudsman again about harm from JS Nodes and

marketing of the defamation at FINRA AWO (there was no response)  What SEC Rule permits

this?  The SEC never responded for this request on potential harm from FINRA R. 12904(h).

A retail retirement investor needs clarification from SEC: Why can any broker or broker dealer or FINRA create a Google Marketing Tag linking an investor's name directly to something (anything) at the FINRA Awards Online.

Please provide the SEC/FINRA Rule that approved this. I understand FINRA Awards Online is public, but the use of Google Marketing tags to collect data on hits to an investor's name, who is also CEO of a competitor has not been approved by the SEC or has it? If the SEC has approved this data analytics by any broker, broker dealer or FINRA please provide the relevant approval and approval process by the SEC. This matter is urgent, due to coronavirus prohibiting access to a court order in White Plains NY. Please remove immediately and if the Court Order is denied and if the SEC has the rule that permits such data analytics at Google, please advise asap.

**August 4, 2020** – Petitioner contacted SEC Office of Ombudsman *again* for assistance on

marketing a known defamatory award and new Google Search to Petitioner's name to PII under

Privacy Act of 1074 that should be sealed by FINRA (Exhibit E).

**March 4, 2021** – Petitioner was advised to contact the SEC Office of Inspector General.  She did

so about lack of response from SEC.  (See Exhibit F)

**March 2021** – FINRA Office of Ombudsman email instructs Petitioner "administrative

remedies" have been exhausted.  "Here is FINRA's OLG contact information to file suit."

**May 24, 2021** – In a May 24, 2021, letter from former Inspector General Carl Hoecker to SEC

Chairman Gary Gensler, Mr. Hoecker informed Chair Gensler of misrepresentations to Congress

about TCR's and Ombudsman Complaints (See Exhibit G)

**August 3, 2021** – Petitioner files Writ of Mandamus since the SEC was placing their SRO's

marketing and harassment actions against Petitioner over their SRO.  Petitioner seeks resolution

of Section 20 ( e) violations of the Exchange Act by FINRA in FINRA Arbitration 17-01857.

**February 2, 2022** – Petitioner files Complaint against FINRA due to ongoing harm from marketing defamation through FINRA Awards Online and non-redacted PII by their Member Firm, causing identity theft; after pleading with FINRA and SEC to order FINRA to cease and desist.  Such refusal resulted in not only defamation to personal reputation; but professional defamation by tagging the defamation to Petitioner's business in a knowledge graph.

**February 3, 2022** – SEC files response to Petitioner's Request to Deny Motion to Dismiss Writ and fails to acknowledge any of Petitioner's previous filings with the SEC for protection from harm by their SRO and repeats the defamation further harming an investor.

**August 24, 2023** – Petitioner is harmed again by FINRA member firm, USB/USBI by failure of resolution of FINRA Arb 17-01857 (false SAR filed by USB/USBI) through blocking of a wire transfer and ongoing false implications Petitioner is engaging in AML/money laundering. (See Exhibit August 24, 2023, Letter to USB/USBI Counsel James Chosy.)

### PETITIONER WAS INSTRUCTED TO EXHAUST ADMINISTRATIVE PROCEDURES BEFORE FILING A LAWSUIT IN COURT

39. Petitioner was repeatedly instructed to first exhaust administrative remedies before filing a lawsuit. As the Timeline demonstrates she did so. Petitioner filed the defamation claim with the SEC within one year of the defamation.  The SEC opened an investigation for the harm within one year of the creation and first publication of the defamation at FINRA AWO.   However, the SEC Office of Investor Advocacy never responded. As set forth in Exchange Act Section 4(g) (4), 15 U.S.C. § 78d(g)(4), the Investor Advocate is required to perform the following functions:

**Assisting Retail Investors**
Exchange Act Section 4(g)(4)(A) directs the Investor Advocate to assist retail investors in resolving significant problems that investors may have with the Commission or with SROs. To help accomplish that objective, the Investor Advocate has appointed an Ombudsman to, among other things, act as a liaison between the Commission and any retail investor in resolving such

problems. As required by statute, a semi-annual report from the Ombudsman is included within this Report on Objectives.

Petitioner cannot recall who instructed her to contact the SEC Exam Hotline, but she did so on March 4, 2021.(Exhibit F)

"The Division of Examinations' Office of Chief Counsel administers an Examination Hotline in coordination with the SEC's Office of Inspector General, an independent office within the SEC that conducts audits of agency programs and investigates allegations of employee misconduct."

   40. **Congress Created the SEC Office of Investor Advocate and Ombudsman but Did the SEC Violate Congressional Mandates that harm Investors?**

   1.  Congress created the SEC Office of Investor Advocate and Ombudsman. Petitioner filed numerous Complaints as instructed by the SEC Ombudsman and FINRA Ombudsman without *any* response[7].

   2.  The SEC did not oversee the SEC Ombudsman that resulted in the harm to Petitioner.  Specifically, a few of the issues that the SEC Office of Inspector General claimed:

   --The U.S. Securities and Exchange Commission (SEC) Office of Inspector General (OIG) investigated anonymous allegations that the former SEC Ombudsman provided false statements to OIG auditors regarding the SEC's Tips, Complaints, and Referral (TCR) program,

---

[7] "The U.S. Securities and Exchange Commission (SEC) Office of Inspector General (OIG) investigated anonymous allegations that the former SEC Ombudsman provided false statements to OIG auditors regarding the SEC's Tips, Complaints, and Referral (TCR) program, and that the former Ombudsman violated SEC Regulation (SECR) 3-2 (TCR Intake Policy) by failing to enter TCRs in accordance with SEC policy."  SEC Office of Inspector General, August 29, 2022, findings related to former Ombudsman: https://www.oversight.gov/sites/default/files/oig-reports/SEC/Findings-Related-Former-SEC-Ombudsman.pdf

and that the former Ombudsman violated SEC Regulation (SECR) 3-2 (TCR Intake Policy) by failing to enter TCRs in accordance with SEC policy.

--We also found that the former Ombudsman violated SECR 3-2 by failing to enter TCRs on investor matters received by the Office of the Ombudsman that warranted entry. Moreover, the former Ombudsman directed staff within the Office of the Ombudsman to refer investors to enter their own TCRs on matters related to alleged securities law violations or fraud, rather than entering the matters into the TCR system or forwarding the matters to a TCR point of contact, as SECR 3-2 requires.

41. In their response to the Writ, the SEC was aware of the numerous Complaints filed with the SEC Ombudsman yet failed to alert the Court of such complaints filed by Petitioner and the SEC's knowledge of the harm by the failure of the SEC Ombudsman to respond to Petitioner's complaints about FINRA and USBI.

1. SEC received multiple official complaints (TCRs) that are relevant to the Writ of Mandamus.  In the response to the Writ, ECF 14-1, the SEC did not disclose these complaints and misrepresented them to the DC District Court. Plaintiff will argue that the SEC is not acting in good faith and is potentially violating their duty of candor to the tribunal. This will have serious implications for the litigation.

2. Furthermore, while the SEC might attempt to shift blame to the Ombudsman or any other internal entity or personnel, it is the SEC's responsibility to oversee its internal **components,** including the Office of the SEC Ombudsman. Similarly, the SEC is tasked with the oversight of its SROs like FINRA. Therefore, if there are lapses or violations at any of these levels, the SEC could be held responsible, as they have the ultimate duty of oversight.  In addition to the actual TCR's filed with the SEC on this ongoing issue that Petitioner will file with the Court, Petitioner highlights:

3. The GAO has provided several annual investigative reports that the SEC approves FINRA rules, but then fails to review them after approval or when technology changes. Petitioner was harmed since SEC failed to ensure FINRA R. 12212 (c ) was not used to violate due process as they were warned. The SEC never reviewed potential conflicts of interest and due process with FINRA's for profit website selling the Awards in effect to others –monetizing the Awards and failed to make changes to FINRA R. 12904 (h) that was harming investor through FINRA's Google Analytics and marketing of an Award through a knowledge graph.

**42. (1) Improper Use of FINRA 12212(c) due to Deficient Rule Making Oversight by SEC**

One of the claims before FINRA Panel in Arbitration 17-01857 was best execution violations for delays in option limit order routing to a market maker, causing losses and inability to trade limit orders on timely basis. Elements of this claim, best execution, were before a Congressional Hearing on June 10, 2021. Instead of deliberating on investor protection on what constituted prompt option limit ordering routing for retail investors, FINRA and Panel permitted Respondent and Counsel, Dorsey & Whitney "Dorsey," to focus the entire Hearing on Claimant's behavior.

The concept of Claimant's inappropriate behavior, a defamatory claim, filed without service to the Plaintiff in *Kosen et al*, Docket 35-1, was used by "Dorsey" (Partner Shawn Larsen-Bright) again in FINRA 17-01857, 14 years later. Larsen-Bright engaged in a subpoena of

documents improperly[8] enjoined in *Kosen et al*, NASD 03-02699, as their principal defense for another broker-dealer in 17-01857. The Motion to enjoin NASD 03-02699 in *Kosen et al*, (1:02-cv-00082JMC) had been filed by "Dorsey" without proper service in *Kosen*, Docket 35-1, 14 years prior. Petitioner Seltzer did not learn, until May 2021, of the defamatory documents filed by "Dorsey" in 2004, and a direct violation of Federal Law (EEOC Complaint) that "Dorsey" had filed, without service, violating FRCP 5 and LCvR5.4 (d). Larsen-Bright then used these same defamatory comments taken from his firm's improper publication in Court of an EEOC Complaint, filed with the EEOC, 19 years prior, and exchanged in mediation, subject to strict confidentiality rules of this Court. The fact that a Panel Chair permitted, such an irrelevant and defamatory theory, that claims derived from an EEOC complaint and a 2004 NASD proceeding, were to dominate investor protection claims of best execution failures, and delays in option limit order routing to market makers, questions the overall oversight of FINRA Arbitration Forums by the SEC.

43. The SEC's lack of ministerial oversight has failed to protect investors from disparate treatment. What 'behavior' constitutes the right of a FINRA Panel to dismiss claims with merit, with prejudice? Chair Gormly, is on the record, without Claimants' knowledge, until hearing the recordings six months later, of falsely accusing the Claimants of bank loan fraud; implying

---

[8] At this point in time, (March 2018)  Petitioner had no knowledge of the improper enjoinment, due to lack of service to her.  She first discovered this in the tags to Docket 35, in 1:02-00082 JMC, by courtlistener.com in August 2020 and filed a complaint with the SEC Ombudsman immediately (Exhibit E).  However, the SEC did not respond, and Petitioner had ongoing PII exposed, now blatantly attached to her name in a Google Search.

Claimants are so violent the security guard would bring in his stun gun and laughing repeatedly at Claimants on the record.

44.  Petitioner does believe the significant evidence of false accusations against Petitioner were to solely to protect a member firm under its SDNY Deferred Prosecution Agreement and that is why USBI/USB filed the false SAR; that is causing ongoing harm. (1) The Panel appeared to engage in an extortive scheme to block USBI Chief Legal Officer and Compliance Officer from appearing at the Arbitration so Petitioner could question them under Oath.  (2) Why would FINRA Director of Arbitration violate a basic ADA request to permit in-person testimony of USBI's Chief Legal Officer, Gail Marie Van Horn?  (3)  Why would FINRA Director Richard Berry intervene and file information on a SAR without first notifying the Claimants, in direct violation of FINRA Forum Rules?  (4)  Why would FINRA staff contact the Panel Chair, the first night of the Hearing, to falsely imply Petitioner was so violent a stun gun would be necessary? (5) Why would FINRA staff contact the Panel Chair the first night of the Hearing to imply Claimants (Petitioner) engaged in "bank loan fraud"? (6) Why would FINRA hire a security guard, Ray Pezolt, with a previous history of permitting abuse against women, to go on the record with the Panel Chair to imply, falsely and with no evidence, that Petitioner potentially engaged in bank loan fraud and was so violent (with no evidence) that he would bring in his stun gun and the Panel Chair then asked, "May I have it?" (See Exhibit E, *Seltzer v Gensler*, ECF 1-1, P. 22)  These are the issues pending in the April 24, 2019, investigation by the SEC for which the Petitioner deserves a fair and just response from the SEC. (See Exhibit A to this Draft Amended Writ)

45. The SEC breached their ministerial duty to ensure FINRA provided guidance on application of such a new Rule, 12212(c) as stated NASD would do in the Federal Register in

2007.[3] Such sanctions demand (1) specific evidence of improper behavior, (2) ability to reply to such sanctions, (3) the sanctions cannot violate any law, (which the sanctions in 12212 (c) did in FINRA Arb 17-01857. (Americans with Disability Act (ADA) and Colorado defamation law) and must be based on an "intentional and material violation" of a Panel Order.

46.  The Proposed Rule 12212(c) in Federal Register, Volume 89 No, 17, Page 2573 states "Panel has authority to issue sanctions for any "violation of the Customer Code" and from "employing abusive tactics". The SEC has a ministerial duty to provide guidance on new rules if FINRA insists to SEC they will do so; to protect investors in accordance with Exchange Act. The SEC was warned by the Securities Industry Marketing Association (SIA) that the proposed rule as structured would violate a broker or investor's constitutional right to be heard. (See Exhibit H)

47. The SEC has not finalized implementation of FINRA Rule 12212 (c). It is being used to dismiss a case with prejudice based on violation of the legal right to be heard, by same Counsel, Dorsey & Whitney's violative actions in another proceeding prohibited by D.D.C. LCvR 84.9 (3). Dorsey & Whitney engaged in concealment to improperly obtain enjoinment of NASD 03-02699 in *Kosen et al*, (D.D.C. 02-00082JMC) without service to Plaintiff Seltzer. (See related case, *Seltzer v Lieder et al*, 1: 22-cv—329JMC)

48.  FINRA reviewed and approved AWARD 17-01857 knowing the Award document did not cite proper legal standards in dismissing the Claims with prejudice based on 12212(c). What intentional violation of the Customer Code did Claimants violate? None. What abusive practice

did Claimants engage in? None. Frustration by a Pro Se Claimant over disparate treatment, over repeated abuse under cross examination, is not an "abusive tactic".[9]

49. Comments in the Federal Register raised concerns of 12212(c) as did another Arbitration Forum: "Several features of this rule are worth noting. First, there is no description of the type of sanction. Rather, they must be "appropriate." Presumably that means that the remedy should be tailored to the wrong-a corrective measure no greater than necessary to maintain fairness, professionalism, and civility. On the other hand, a range of sanctions is contemplated by Rule R-58, up to but not including a default. An arbitrator can "limit" a party's "participation in the arbitration" but what is contemplated by this sanction is not clear. Does it mean that a boisterous party representative can be excluded from a hearing room? An arbitrator can also make an "adverse determination of an issue or issues." [8] Petitioner's legal rights were harmed by SEC's failure to oversee the rulemaking process from 2007 to present, for 12212(c)-- the subject of this Writ, that caused the defamation and breached Petitioner's constitutional right to be heard, before Sanctions are ordered without a Panel Order, as mandated by FINRA R. 12212(c).

50. It appears SEC's lack of oversight of FINRA Rulemaking permitted Panel Chair Gormly to abuse powers of the arbitration contract, Claimants had entered. Did Panel Chair Gormly have inherent powers to issue sanctions, against counsel, in this case Pro Se Claimants? *Inter-Chem Asia 2000 Pte. Ltd. V. Oceana Petrochemicals AG,* 373 F. Supp. 2d 358 (S.D.N.Y. 2005)? The district court added that finding inherent authority would violate the principle that the arbitrator's authority is circumscribed by the parties' agreement that, while it could have done so, failed to

---

[9] Volume 89 No. 17, Page 2573 "NASD also said it intends to provide guidance in arbitrator training materials in the Customer Code on how and when this rule should be applied."

provide authority for sanctions against a party's counsel: "That principle flows from the basic understanding that arbitration is a consensual arrangement meant to reflect a mutual agreement to resolve disputes outside of the courtroom. *InterChem and Oceana* could have included in the Contract a clause bestowing on the Arbitrator the authority to award sanctions for either parties' abuse or frustration of the arbitration process. Granting the Arbitrator authority beyond that granted to him by the parties' conflicts with the most basic principles underlying the arbitration process." Petitioner's contract for arbitration with USBI did not permit sanctions.

51. FINRA represented to SEC in Federal Register in 2007 and 2008 concerning Rule Change to 12212 (c): "FINRA believes that the proposed rule change is consistent with the provisions of Section 15A(b)(6) of the Act, which requires, among other things, that FINRA rules must be designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and, in general, to protect investors and the public interest.

**(2) FINRA Use of Nodes and AWS Wrappers to Tag FINRA Award based on Defamation to an Investor's Name** (See attached, Exhibit C of the Original Writ, DKT 1-1, P. 4)

52. Secondly, the SEC approved Terms of Agreement for the publication of FINRA Awards Online(AWO) and refuses to protect investors when FINRA violates the approved Terms of Use, causing significant investor harm and violates defamation laws. FINRA and Arbitration Panel Chair Gormly breached Petitioner Seltzer's constitutional rights and dismissed all Claims in FINRA Arbitration 17-01857 based on "Sanctions" that Petitioner Seltzer had no knowledge of and was never permitted the opportunity to reply to the truthfulness of the Sanctions by FINRA and the Panel.

FINRA Awards Online Terms of Agreement – Restrictions (L)

"l. use Arbitration Awards Online or the data contained therein in any unlawful, fraudulent, misleading, obscene, harmful, threatening, harassing, defamatory or hateful manner, that

invades the privacy of any third party, for any unlawful purpose, or in any manner inconsistent with these Terms of Use;

a. use Arbitration Awards Online data for unsolicited marketing of goods or services;"

**Ongoing Harm from FINRA's Knowledge Graph Violating Google Policy:**

53. The SEC has a nondiscretionary duty to ensure that its SRO, FINRA, adheres to existing data privacy laws and Google's policies. In this case, FINRA has violated those norms by utilizing Google Analytics to inappropriately associate Petitioner's personal and business details in a knowledge graph, attached to defamation resulting directly from FINRA and the SEC prohibiting the Petitioner the right to be heard. This conduct by FINRA not only undermines data privacy laws but also calls into question the ethical integrity of the SRO.

**54. SEC is permitting FINRA to improperly gather data analytics on individuals who file claims in its forum**. This practice risks violating due process by potentially influencing public opinion and damaging the reputation or career of an investor.

**55. SEC is permitting FINRA to engage in deceptive practices, such as false advertising concerning the purpose of its knowledge graph technology**. While FINRA claims the technology is designed to identify 'rogue' brokers, it appears to be weaponized against investors who have filed legitimate complaints in FINRA's arbitration forum.

56. FINRA targeted Petitioner in their marketing of the defamation tagged to Petitioner's name in Google Searches, repeatedly. FINRA then used its new AWS Kendra knowledge graph technology to tie the defamation in a Google Search FINRA created knowledge graph to

Petitioner's business.  Petitioner filed a consumer protection claim[10] with the NYAG, as the Terms of Service of the Awards Online (AWO) states claims must be filed in the State of NY. (See Exhibit B, attached.)

**See Knowledge Graph, *Seltzer v FINRA*, Docket 1, Page 34. Related case, 1:22-cv-03330**

56. See 1:22-cv-0330JMC- ECF 1. P. 34-37 FINRA Created Knowledge Graph

1. <u>FINRA's Public Statement</u>: If FINRA made a public statement about using knowledge graph technology specifically for "rogue brokers," does that set a clear intended use case for the technology? It would be reasonable to assume that their primary goal is to organize and present data about brokers who have had negative arbitration outcomes; not tagging a business to a Claimant's Award in a FINRA-created knowledge graph.

2. <u>Unique Application to an Investor</u>: Petitioner is not a broker, and was included in such a knowledge graph, while no other investor has been to date. This is indeed unusual based on the intended use case FINRA has stated. It could suggest that this inclusion was not a routine application of their technology, especially if no other investor has been similarly profiled.

3. <u>Proof of Creation:</u> The direct creation of a knowledge graph is a deliberate act. It is not something that happens passively. While Google and other search engines automatically crawl and index the web, a structured knowledge graph, as described in the AWS tutorial, requires more proactive effort. If FINRA created it, there should be data or records

---

[10] "I write to you as referred by Letitia James, Attorney General, State of New York Office of the Attorney General, referral to SEC NY office, their file Number 19-041329, attached correspondence, dated October 17, 2019."

indicating their actions.  Petitioner attaches Exhibits I, I-1, I-B, and I-C which demonstrates the bias by FINRA's use of Awards Online against Petitioner as compared to its use tagging a broker.  Did FINRA block their website from crawling the Awards against Brokers?  Only discovery can determine this fact.

4. <u>Intent and Purpose:</u> The key legal issue often comes down to intent. The creation of a knowledge graph is neutral—it's a way of organizing data. The critical question would be why was the Petitioner's business included by FINRA in the knowledge graph, attached to the defamatory award document in January 2022 (see related Case *Seltzer v Lieder*, ECF 1, P. 24,) especially if it deviates from their stated use case of focusing on "rogue brokers?"

5. Automated Processes: While knowledge graphs are structured deliberately, the actual data inclusion can be automated. It's possible for entities to be included based on certain data parameters without specific manual intervention.  Discovery could answer this critical question.

**57. SEC is permitting FINRA to engage in deceptive practices, such as false advertising concerning the purpose of its knowledge graph technology**. While FINRA claims the technology is designed to identify 'rogue' brokers, it appears to be weaponized against investors who have filed legitimate complaints in FINRA's arbitration forum.

58. <u>Authority of Court that Permits this Writ of Mandamus</u>

The United States District Court of the District of Columbia has authority to enforce such ministerial duty. The power of a district court to compel official action by mandatory order is limited to the enforcement of nondiscretionary, plainly defined, and purely ministerial duties.[13] See *Decatur v. Paulding*, 39 U.S. (1 Pet.) 496, 514-17 (1840). The duty in this Writ is "in this

situation is so plainly prescribed as to be free from doubt and equivalent to a positive

command." *Wilbur v. United States.*

59. "The Overview of the Federal Scheme for the Commission's Oversight and Regulation of

SROs Under the Exchange Act provides for investor protection:

"The regulation of the nation's securities markets has long relied in large part on the

efforts of the SROs, subject to Commission oversight. <u>See generally</u> S. Rep. 94-75, 94th Cong.,

1st Sess. 22-23 (1975). SROs are required to register with the Commission, to promulgate rules

governing the conduct of their members, and to enforce compliance by their members with those

rules and with the federal securities laws. <u>See</u> Section 6 of the Exchange Act, 15 U.S.C. 78f

(regarding securities exchanges); Section 15A of the Exchange Act, 15 U.S.C. 78o-3 (regarding

securities associations); Section 19(g) of the Exchange Act, 15 U.S.C. 78s(g) (enforce

compliance with rules). Under these sections, the SRO's rules must be approved by the

Commission and must be consistent with the requirement that SRO rules be designed to prevent

fraudulent and manipulative practices; to promote equitable principles of trade; and generally, to

protect investors and the public interest.

60. FINRA Rule 12212(c) states: "In addition, a party may file a motion to dismiss based on

Rules 12212 and 13212 (for material and intentional failure to comply with a panel order if prior

warnings or sanctions have proven ineffective) https<u>://www.finra.org/arbitration-</u>

<u>mediation/faq/motion-to-dismiss</u>  The SEC is permitting FINRA to violate Petitioner's

constitutional right to be heard.  There was not any material and intentional failure to comply

with a panel order.  *There was no Panel Order.*

61. The SEC did not heed the warning about the Rule would violate a broker or investor's

constitutional right to be heard. "Alternatively, providing for publication of the grounds for

disapproval under consideration subsequent to the initial publication of the proposed rule change

in the Federal Register recognizes that commenters or the Commission may identify an issue

with a proposal after a proposal was published for comment that warrants the institution of

proceedings to determine whether to disapprove the proposal." Page 8

https://www.sec.gov/rules/final/2011/34-63723.pdf . The issue was identified, and the SEC

ignored the constitutional issue, that then resulted in the harm to Petitioner.

**62. NASD also stated that it intends to provide guidance in arbitrator training materials on
the Customer Code on how and when this proposed rule should be applied."** SEC failed to

ensure that FINRA provided such guidance in arbitrator training materials on how and when to

use FINRA Rule 12212(c).

**63. The SEC violated new Dodd-Frank standards on FINRA Rulemaking:** In 2011, in

conjunction with Dodd Frank rulemaking the SEC defined new standards for FINRA

Rulemaking, that included, "Specifically, the Commission is adopting rules to outline the

procedures that it will follow when exercising its authority under Section 19(b)(2)(A)(i)(II) of

the Exchange Act, pursuant to which the Commission either (1) may institute proceedings to

determine whether a proposed rule change filed under Section 19(b)(2) should be disapproved or

(2) shall institute such proceedings to determine whether to disapprove an immediately effective

proposed rule change filed under Section 19(b)(3)(A) that the Commission determined to

temporarily suspend." See Exchange Act Section 19(b)(2)(C); 15 U.S.C.78s(b)(2)(C) (setting

forth the standards applicable to Commission approval or disapproval of a proposed rule

change).

64. AAA's 2013 Commercial Arbitration Rules now contain a rule entitled, "Sanctions." *"The*

*arbitrator may not enter a default award as a sanction".* Panel Chair Gormly provided no legal argument, no evidence, not one document, for issuing sanctions and entering a default award as a sanction in FINRA Arbitration 17-01857, when the merits of the case prohibited such dismissal.

65. An arbitral award must be final and definite before it can be reviewed by a court. "To be considered final, an arbitration award must be intended by the arbitrator to be a complete determination of every issue submitted. It must resolve all the issues submitted to arbitration definitively enough so that the rights and obligations of the parties, with respect to the issues submitted to the arbitrator, need no further adjudication."515 Citing *Yaseen,* the Dallas Court held that an arbitration panel's "partial final award" ruling that it had jurisdiction to adjudicate the merits of the parties' dispute was not final, and *thus not reviewable by vacatur*, because the award did finally resolve claims. The Writ before Court is ministerial; could a Court review FINRA Arbitration 17-01857; was it even reviewable by vacatur or is this Writ necessary to protect Petitioner's rights to be heard and the SEC's permission to Arbitrators and FINRA to violate rules that were not properly overseen by the SEC causing irreversible harm to an investor, through breach of Petitioner's constitutional right to due process?

Violation of Terms of Service of FINRA Awards Online (AWO)

66. As the Timeline above demonstrates, FINRA refuses to cease and desist from linking false and defamatory hearsay in FINRA Arbitration 17-01857 in direct violation of Rules promulgated by SEC for FINRA Awards Online Terms of Agreement. Courts have recognized FINRA's privilege is "subject to limitations" if a party maliciously asserts false and defamatory charges in judicial proceedings for the purpose of publicizing them in the press.

*Bridge C.A.T. Scan Associates v. Ohio-Nuclear Inc.,* 608 F. Supp. 1187 (S.D.N.Y. 1985) FINRA is no longer entitled to claim immunity, statutory or otherwise.  As the Timeline above

demonstrates, the SEC is protecting its SRO over its non-discretionary duty to protect an investor.

67. The SEC has a duty to continuously oversee the implementation of rules by their SRO and take immediate action if they are harming an investor. Petitioner Seltzer complained about such harassment to SEC Office of Ombudsman. (See Exhibit C attached to the original Writ, ECF 1-1,Page 4) However, FINRA recommended tags through AWS wrappers.

"Further, because of the short timeframe for noticing a proposal that is established in revised Section l 9(b) of the Exchange Act, the Commission may be compelled to publish filings that are later found to raise concerns under the Exchange Act, in which case *the Commission may decide to institute proceedings subsequent to the initial publication of the proposed rule change in the Federal Register. 15 U.S. Code § 78s - Registration, responsibilities, and oversight of self-regulatory organizations permits the Writ to issue, due to violation of SEC oversight of* **FINRA.**

The United States district court has jurisdiction of "an action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

68. **Petitioner relied on honesty of SEC** and followed instructions to first exhaust administrative remedies, SEC Office of Ombudsman and SEC investigation:

- Petitioner believed the SEC was investigating the harm for Defamation and Potential Section 20 (e)-- On April 24, 2019, Petitioner received notice that Ms. England, SEC Deputy Counsel (Exhibit A)would be investigated the claims of defamation, threats with a stun gun, false criminal allegations by FINRA and hired contractor, and misuse of FINRA R.12212 and misuse of SAR.

- The District Court of the District of Columbia dismissed our claims, *Seltzer v FINRA*, based on statute of limitations for defamation – one year.  However, the SEC began their investigation (April 24, 2019) within one year of the close of the Arbitration, September 5, 2018.  Petitioner should not be penalized for being told by SEC to first seek remedy for the defamation through the SEC Ombudsman and to wait for the SEC investigation.

69. **Reason for the Delay**: The SEC failed to protect an investor and inform the Courts why Petitioner had delayed bringing the lawsuit. The delay was due to reliance on the government investigation. The court might have been more likely to toll the statute of limitations if they had been informed of this fact in the Writ.

70. **Communication with the SEC**: Despite repeated telephone and requests, the SEC failed to communicate with Petitioner about the expected duration of the investigation, any findings they made, or recommendations for next steps..

71. **Diligence in Protecting Your Rights**: Petitioner tried to monitor the SEC's investigation, inquired about its status, tried to work with the SEC Ombudsman and acted shortly after the SEC Ombudsman did not respond and the FINRA Ombudsman finally told me my only option now is to sue, which occurred shortly thereafter, on August 3, 2021.

72. **General Equity Considerations**: Tolling is often rooted in equity.  In this instance, the SEC has still not responded to the investigation which delayed the lawsuit against FINRA and the SEC.

73. **"Private actors must be subject to supervision by a government agency that itself is subject to the Appointments Clause."**

The SEC is not supervising FINRA; in fact, the SEC is permitting FINRA to intentionally harm investors and defends FINRA's actions when the investor seeks protection.  The SEC responds to the Court with no evidence that the harm caused by an investor from FINRA R. 12212( c) is strictly because the investor engaged in "bad behavior" that was falsely claimed by FINRA and the Panel to potentially engage in a Section 20 (e ) violation of the Exchange Act.  Plaintiff had no opportunity to respond to either FINRA or the SEC on such hearsay, defamation per se and false allegations that resulted in harm  from breach of her due process rights.

**74.**  In sum, as the DOJ wrote in *Kim, "*Enlisting the aid of private actors within the constraints of *Adkins* are just one more mechanism available to Congress under the Constitution for arranging for the performance of government functions. The public accountability goals that the Appointments Clause serves are amply met by the fact that under the private nondelegation doctrine embodied in *Adkins*, any such private actors must be subject to supervision by a government agency that itself is subject to the Appointments Clause. Cf., e.g., *Oklahoma*, 62 F.4th at 228 (explaining that the constraints of the private nondelegation doctrine serve to address concerns that "transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable" might "undercut[] representative government").

**75.** SEC Ombudsman failed to honor Petitioner's Request to have FINRA seal the unredacted PII, (Petitioner's social security number, birth date, maiden name, height, weight, eye color) as mandated by FINRA's 1999 Memorandum of Understanding with the SEC.  Reference Email Exhibit H to FINRA Director of Enforcement and SEC Ombudsman Request that the

SEC never responded to, causing irreversible harm. Reference Exhibit E – Ombudsman
Request on August 20. 2020 - #15979-435-88.

76. FINRA and SEC refused to seal Petitioner's PII upon discovery of such exposure of PII
tagged to Petitioner's name in a Google Search in August 2020.   Such exposure to PII,
picked up by private data bases (See *Seltzer v FINRA*), has caused Petitioner irreversible
exposure to ongoing identity theft.

77. **Dispute over FINRA's Duty under 1999 Memorandum of Understanding:** SEC is
permitting FINRA to make false claims to the District Court of the District of Columbia
that it has no obligation under a 1999 Memorandum of Understanding with the SEC to
enforce its Member firms' compliance with the Privacy Act of 1974. Contrarily, the SEC
has a nondiscretionary duty to safeguard individuals from violations of federal laws,
including the Privacy Act of 1974, particularly when their self-regulatory organization
(SRO) is involved.


**STATEMENT OF RELIEF SOUGHT**

78. Pursuant to 5 U.S.C. § 706(1) and 28 U.S.C. § 165l(a), Petitioner Seltzer requests that
the Court issue a writ of mandamus directing the Securities and Exchange Commission
("SEC") to issue Sanctions against FINRA, SRO, for their breach of duty to SEC under
APA, specifically related to failures and representations to the SEC in FINRA Rule
12212(c) rule making process and failure to enforce Terms and Conditions of Use of their
Awards Online Agreement made publicly available to investors who file Claims in
FINRA Arbitration forum. Petitioner Seltzer requests, due to violations of her due
process and posting of a defamatory and false Award with malice and repeated

publication of the defamatory Award, tied to Petitioner's name in a Google Search, the

Award be stricken from FINRA Awards Online or sealed. There is no other remedy.

The SEC never approved the use of "nodes" and "AWS wrappers" to harass and defame an

investor though FINRA Awards Online. The existing Terms of Use of AWO prohibit harassment

and defamation and FINRA refuses to cease and desist. (Exhibit A, ECF 1-1 P. 1)

- **SEC is permitting FINRA to engage in deceptive practices, such as false advertising concerning the purpose of its knowledge graph technology**. While FINRA claims the technology is designed to identify 'rogue' brokers, it appears to be weaponized against investors who have filed legitimate complaints in FINRA's arbitration forum.

79. Petitioner has demonstrated in this Writ, the three elements to properly issue Mandamus: (1)

a clear right in the plaintiff to the relief sought; (2) a plainly defined and preemptory duty on the

part of the defendant to do the actin question; and (3) no other adequate remedy available.

Lovallo v. Froehlke, 468 F.2d 340, 343(2d Cir. 1972). Cervoni v. Sec'y of Health, Ed. &

Welfare, 581 F.2d 1010, 1019 (1st Cir. 1978).

80.  A district court's power to compel official action by mandamus is limited to the enforcement

of plainly defined, purely ministerial, nondiscretionary duties. This Writ of mandamus is limited

to the enforcement of a clearly defined ministerial duty by the SEC.

_Wilbur v. United States, 281 U.S. 206,218 (1930)_ This Writ describes an administration of

statutes, in a particular situation so plainly prescribed as to be free from doubt and equivalent to a

positive command, it is regarded as being so far ministerial that the performance may be

compelled by mandamus." The Writ is not excluded by the waiver's two provisos [in 5 U.S.C. §

70l(a)]." Gentile v. SEC. 974 F.3d 311, 316 (3d Cir. 2020). Specifically, "5 U.S.C. § 702.

  C. "Statutory standing under §702 depends on agency action". To have such standing, a person

must suffer a legal wrong because of agency action or, under the zone-of-interests test, a person

must be "adversely affected or aggrieved by agency action within the meaning of a relevant

statute." Petitioner suffered a "legal wrong" because of lack of follow-up to meaning of changes to FINRA Rule 12212 (c)[41] as FINRA represented to the SEC they would do to ensure changes to Rule 12212 (c) were communicated properly to FINRA Arbitrators.

81. Due to lack of SEC oversight of FINRA rulemaking, Petitioner was harmed by defamation that forced her to dissolve her business, Check the Ticker SBC, since she could no longer tolerate the ongoing harassment by FINRA through their marketing of the defamation per se through FINRA's proprietary website, SEO marketing of the defamation tagged to Petitioner's name in a knowledge graph that was tied to her business.  (ECF 1, Page 34)

82.   Due to lack of SEC oversight, FINRA is engaging in a Section 20(e) violation of the Exchange Act and misused a FINRA Forum to defame an investor to protect their member firm, USBI, from violation of their SDNY Deferred Prosecution Agreement that is causing ongoing harm to Petitioner and her family.

83.   Petitioner respectfully requests that the Court issue Amended Writ to ensure that the SEC place the interests of an investor over its SRO:

- Seal FINRA Award 17-01857 since it was created in violation of Petitioner's constitutional right to be heard, due to the SEC's lack of oversight of FINRA rulemaking.

- Complete its investigation of the potential violation of Section 20 (e) of the Exchange Act to protect an investor that is causing ongoing harm due to the false SARS filed by USBI and advise Petitioner of the result.  Involve the Petitioner in the investigation to ensure data and discovery is not one-sided and only from the standpoint of its SRO.

- Request FINRA rescind its false claims that Petitioner and her spouse engaged in "bank loan fraud" and potential money laundering."

- Take action to enforce all pending Whistleblower Claims against FINRA and USB/USBI for their violation of their duties to an investor in their Forum that has caused irreversible harm to an investor; including working with USB and USBI to end ongoing harm from the false SAR.

CONCLUSION

Given the foregoing, Petitioner respectfully requests the Court enforce this Writ of Mandamus. Attached is Proposed Order, Memorandum of Points and Authorities for this amended Writ of Mandamus and the Leave to file Motion to Strike the defamation from the SEC's initial response to the Writ.

Respectfully Submitted,

Dated: October 4, 2023

/s/ *Susan Seltzer*

Susan Seltzer
Pro Se
Seltzers1971@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 4, 2023, I electronically submitted the foregoing document with the clerk of the court for the United States District Court for the District of Columbia, using the electronic case filing system of the Court. I hereby certify that I have served electronically the following ECF filers.

Respectfully submitted,

/s/ *Susan Seltzer*

Dated: October 4, 2023

Susan Seltzer
Pro Se
Seltzers1971@gmail.com

**ECF Filer List**

Thomas Karr
Juanita C. Hernández

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9612

Attorneys for Respondent